**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
Timothy S. DeJong, OSB No. 940662
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: tdejong@stollberne.com

**RIGRODSKY LAW, P.A.**
Vincent A. Licata (*pro hac vice* forthcoming)
Leah B. Wihtelin (*pro hac vice* forthcoming)
Zachary McGarry (*pro hac vice* forthcoming)
225 Broadway, Suite 3707
New York, NY 10007
Telephone: (212) 201-7690
Email: vl@rl-legal.com
lw@rl-legal.com
zm@rl-legal.com

*Counsel for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| THOMAS HARWOOD III, Derivatively on Behalf of Nominal Defendant NUSCALE POWER CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN L. HOPKINS, ROBERT RAMSEY HAMADY, ALAN L. BOECKMANN, | Case No. 3:26-cv-02366<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT<br><br>JURY TRIAL DEMANDED |

JAMES R. BREUER, BUM-JIN CHUNG, ALVIN C. COLLINS III, SHINJI FUJINO, KENT KRESA, DIANA J. WALTERS, and KIMBERLY O. WARNICA,

Defendants,

and

NUSCALE POWER CORPORATION,

Nominal Defendant.

## INTRODUCTION

Plaintiff Thomas Harwood III ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant NuScale Power Corporation ("NuScale" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding NuScale, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Truedson v. NuScale Power Corp., et al.*, Case No. 3:26-cv-00328-JR (D. Or.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of NuScale against certain of its current and former officers and members of the Company's Board (the

"Individual Defendants")[1] for breaches of their fiduciary duties between at least March 3, 2025, and November 6, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. NuScale is a nuclear power company that purportedly develops small modular reactor ("SMR") technology that the Company believes will deliver safe, scalable, cost-effective, and reliable carbon-free power. The core of the Company's technology is the Light Water Reactor NuScale Power Module ("NPM"). However, since its founding in 2007, NuScale has yet to commercialize or sell any NPMs, and the revenues it generates from engineering and licensing fees and services are small compared to NuScale's overall expenses. Thus, the Company has incurred losses year-over-year since its founding without turning a profit. Accordingly, the commercialization of NPM is crucial for NuScale's continued operations.

3. Before the Relevant Period, NuScale began a project to build a nuclear power plant intended to power small public utilities in the State of Utah called Utah Associated Municipal Power Systems ("UAMPS"). However, in late 2023, the project collapsed despite over ten years of development as the project timeline was pushed back and the price tag skyrocketed. As a result, the Company's stock price fell substantially, and the Company laid off a third of its workforce. Following this disaster, the Company could not find a new customer willing to purchase its NPMs.

4. However, in March 2025, the Company changed its tune. NuScale began to tout an "exclusive" commercialization partnership with ENTRA1 Energy LLC ("ENTRA1"), where ENTRA1 would finance, build, and operate nuclear power facilities powered by NuScale's

[1] The Individual Defendants are John L. Hopkins ("Hopkins"), Robert Ramsey Hamady ("Hamady"), Alan L. Boeckmann ("Boeckmann"), James R. Breuer ("Breuer"), Bum-Jin Chung ("Chung"), Alvin C. Collins III ("Collins"), Shinji Fujino ("Fujino"), Kent Kresa ("Kresa"), Diana J. Walters ("Walters"), and Kimberly O. Warnica ("Warnica"). "Defendants" means NuScale and the Individual Defendants.

reactors. According to NuScale, ENTRA1 was a "one-stop-shop" for potential customers, offering "facility design and construction, development, financing, licensing, manufacturing and operation[al]" capabilities that would deliver nuclear power "within acceptable cost, time and risk profiles."

5. Throughout the Relevant Period, NuScale repeatedly hyped its commercialization partnership with ENTRA1, presenting it as critical to the Company and the future of its NPM technology. Analysts noted how dependent NuScale was on its partnership with ENTRA1, stating that "it is fair to say that Entra1 plays a ***pivotal role*** in [NuScale's] future," that NuScale had "effectively put '***all its eggs in one basket***' with ENTRA1," and that "***NuScale's future success is tied to ENTRA1's reputation and ability to execute on project development***."[2]

6. However, in reality, NuScale's partnership with ENTRA1 was a farce. ENTRA1 had never built, financed, or operated any significant projects, let alone highly technical and regulatorily complex nuclear energy projects. ENTRA1 was instead, as one analyst stated, "***just a couple of guys***" led by entrepreneur Wadie Joseph Habboush ("Habboush"), an individual with preexisting connections to NuScale's executive officers and the Company's then-largest shareholder, Fluor Corporation ("Fluor").

7. By late 2025, the truth began to emerge as NuScale and ENTRA1's partnership had not borne fruit, with the Company failing to announce any updates on its customer contracts. Consequently, NuScale's stock began to plummet, falling $5.33 per share, or approximately 12%, from $44.68 per share on August 7, 2025, to $39.35 per share on August 8, 2025.

8. Nevertheless, despite this partial corrective disclosure, the Company continued to double down on its partnership with ENTRA1. On September 2, 2025, ENTRA1 and the

---

[2] Unless otherwise stated, all emphasis is added.

Tennessee Valley Authority ("TVA") jointly announced an agreement to develop nuclear power plants to provide the TVA with up to six gigawatts of nuclear power using NuScale's NPM inside the energy facilities. NuScale applauded this collaboration, highlighting ENTRA1's purported expertise, with Defendant Hopkins in particular commenting on the "experience" of ENTRA1 which was "exactly what is required" to commercialize the Company's NPMs.

9. On the same day, NuScale announced that its subsidiary NuScale Power LLC ("NP LLC") had entered into a Partnership Milestone Agreement ("PMA") with ENTRA1 wherein NuScale was required to provide ENTRA1 with contribution payments disbursed in tranches triggered by certain developmental milestones. However, upon further analysis into the PMA, it became apparent that the PMA was not a good deal for NuScale, particularly because of ENTRA1's then-undisclosed inexperienced and inadequate operations. Pursuant to the PMA, NuScale was required to provide ENTRA1 with an approximately $500 million cash payment because of ENTRA1's agreement with the TVA, even though the TVA agreement was nonbinding. Moreover, the PMA did not: (i) contain any clawback clause for NuScale to recover funds should ENTRA1 be unable to close the TVA deal, (ii) require ENTRA1 to build nuclear plants on time or on budget, or (iii) require ENTRA1 to use the Company's NPMs. In essence, the Company had bet its commercialization strategy, and hundreds of millions of dollars, on one untested, understaffed partner with zero experience in nuclear power.

10. Following these revelations, on September 4, 2025, the Company's stock price fell $4.39 per share, or approximately 10.9%, from $40.42 per share on September 3, 2025, to $36.03 per share on September 4, 2025.

11. The truth fully emerged on November 6, 2025, when the Company held an earnings call for analysts and investors to discuss its third quarter results for fiscal year 2025 (the "3Q25

Earnings Call"). During the 3Q25 Earnings Call, when answering analysts' questions, Defendant Hamady confirmed NuScale's approximately $500 million payment to ENTRA1. Analysts asked the Company's management whether ENTRA1 was sufficiently experienced to build, own, and operate the energy generation facilities contemplated in the TVA agreement. Defendant Hopkins responded, stating that "[ENTRA1] have . . . over 45 years" of experience "delivering large-scale energy and infrastructure projects worldwide." However, when analysts pointed out that Defendant Hopkins was referring to Habboush Group, a distinctly different entity from ENTRA1, and not ENTRA1, Defendant Hamady confirmed that ENTRA1 did not have relevant experience, contradicting the Company's previous statements and stating that ENTRA1 would ***not*** be "out there building the power plants." Rather, Defendant Hamady stated that ENTRA1's role would be "to coordinate projects, to bring in partners, to get deals and the partners they bring in that can execute . . . ."

12. Following the 3Q25 Earnings Call, Guggenheim Securities published a report undermining the Individual Defendants' claims regarding ENTRA1 and its capabilities (the "Guggenheim Report"). According to the Guggenheim Report, ENTRA1 was a "3-year old company that has ***never built, financed or operated anything***." The Guggenheim Report also stated that, upon review of available information about ENTRA1, there was "no information regarding the company's history, management team, size or capitalization," and just "***3 employees*** and 1 investor as of the writing of this note, notably CEO and Chairman Wadie Habboush." The Guggenheim Report also stated that a "more accurate description of ENTRA1" than one presented by the Individual Defendants "would be that it is an entity supporting the activities of a single individual, specifically Mr. Habboush." Furthermore, the Guggenheim Report lambasted NuScale's lack of transparency regarding ENTRA1, stating that "[w]e do not think that [NuScale]

has been as clear regarding ENTRA1 as it could have been," characterizing the Company's representations regarding ENTRA1 as "problematic."

13. Additionally, after the 3Q25 Earnings Call, the Company's stock price fell $4.03, or approximately 12%, from a closing price of $32.46 per share on November 6, 2025, to a closing price of $28.43 per share on November 10, 2025, over a two-day trading period. The Company's stock continued to decline over the following days, trading as low as $16.96 per share on November 21, 2025, an approximately 70% decline in value from its highest trading value of $56.16 per share during the Relevant Period.

14. As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) ENTRA1 was inexperienced and did not have the established project-development capabilities or resources to commercialize the Company's nuclear technologies or build, develop, finance, or operate nuclear power infrastructure; (ii) ENTRA1 was not a sophisticated entity, but rather "just a couple of guys" with no relevant experience in the nuclear energy field; (iii) as a result, the Company's crucial commercialization strategy was entrusted to an organization without the requisite experience and abilities necessary to facilitate the successful commercialization of the Company's NPMs; (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

15. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Hopkins, Hamady, Boeckmann, Breuer, Collins, among others, in the United States District Court for the District of Oregon.

16. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses including reputational harm and loss of goodwill.

17. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of NuScale's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the claims asserted herein for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

19. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

23. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because NuScale's principal executive offices are located in this District, Defendants conduct business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## **PARTIES**

***Plaintiff***

24. Plaintiff is, and has been at all relevant times, a continuous shareholder of NuScale.

***Nominal Defendant***

25. Nominal Defendant NuScale is a Delaware corporation with its principal executive offices located at 1100 NE Circle Blvd., Suite 350, Corvallis, Oregon 97330. NuScale's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SMR."

***Individual Defendants***

26. Defendant Hopkins has served as the Company's President and Chief Executive Officer ("CEO") and as a director of the Company since December 2012. Defendant Hopkins also served as the Board's Executive Chair from December 2012 to December 2021. Prior to joining NuScale, Defendant Hopkins was employed by Fluor from 1989 to 2012, where he held various leadership positions. Defendant Hopkins is named as a defendant in the Securities Class Action. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 15, 2026 (the "2026 Proxy"), Defendant Hopkins received $4,084,073 in total compensation from the Company in 2025.

27. Defendant Hamady has served as the Company's Chief Financial Officer ("CFO") since August 2023. Defendant Hamady is named as a defendant in the Securities Class Action. According to the 2026 Proxy, Defendant Hamady received $1,871,123 in total compensation from the Company in 2025.

28. Defendant Boeckmann has served as a director of the Company since December 2020 and as Chairman of the Board since January 2025. Defendant Boeckmann also serves as Chair of the Board's Organization & Compensation Committee ("O&C Committee") and Executive Committee, and as a member of the Board's Nominating & Corporate Governance Committee ("N&CG Committee"). Defendant Boeckmann previously served as Fluor's CEO and Chairman from 2002 to 2011, Non-Executive Chairman from 2011 to 2012, and Executive Chairman from May 2019 until May 2022, when he retired from Fluor. According to the 2026 Proxy, Defendant Boeckmann received $253,808 in total compensation from the Company in 2025.

29. Defendant Breuer served as a director of the Company from December 2023 until May 2025. Defendant Breuer also served as Fluor's Chief Operating Officer and the Group President of Fluor's Energy Solutions. On February 17, 2025, prior to the start of the Relevant Period, Defendant Breuer was appointed as Fluor's CEO effective May 1, 2025. Defendant Breuer is named as a defendant in the Securities Class Action.

30. Defendant Chung has served as a director of the Company since December 2022. Defendant Chung also serves as a member of the Board's N&CG Committee. According to the 2026 Proxy, Defendant Chung received $237,900 in total compensation from the Company in 2025.

31. Defendant Collins served as a director of the Company from February 2021 until May 2026. Defendant Collins joined Fluor in 1994 and served as a member of Fluor's executive management team and as Fluor's Group President of Corporate Development and Sustainability throughout the Relevant Period. Defendant Collins is named as a defendant in the Securities Class Action.

32. Defendant Fujino has served as a director of the Company since December 2022. Defendant Fujino also serves as a member of the Board's Audit Committee. According to the 2026 Proxy, Defendant Fujino received $242,900 in total compensation from the Company in 2025.

33. Defendant Kresa has served as a director of the Company since August 2019. Defendant Kresa also serves as Chair of the Board's Audit Committee and as a member of the Board's O&C Committee and Executive Committee. Defendant Kresa also served as a director of Fluor. According to the 2026 Proxy, Defendant Kresa received $262,900 in total compensation from the Company in 2025.

34. Defendant Walters has served as a director of the Company since December 2024. Defendant Walters also serves as a member of the Board's Audit Committee. According to the 2026 Proxy, Defendant Walters received $199,965 in total compensation from the Company in 2025.

35. Defendant Warnica has served as a director of the Company since May 2022. Defendant Warnica also serves as Chair of the Board's N&CG Committee and as a member of the Board's O&C Committee and Executive Committee. According to the 2026 Proxy, Defendant Warnica received $208,185 in total compensation from the Company in 2025.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36. By reason of their positions as officers and/or directors of NuScale, and because of their ability to control the business and corporate affairs of NuScale, the Individual Defendants owed NuScale and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NuScale in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of NuScale and its shareholders.

37. Each director and officer of the Company owes to NuScale and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

38. The Individual Defendants, because of their positions of control and authority as directors and/or officers of NuScale, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39. The officers and directors of NuScale were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

40. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of NuScale, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

41. As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

42. To discharge their duties, the officers and directors of NuScale were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of NuScale were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to NuScale's own Code of Business Ethics Program (the "Code of Conduct");

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how NuScale conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of NuScale and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NuScale's operations would comply with all applicable laws and NuScale's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

43. Each of the Individual Defendants further owed to NuScale and the shareholders the duty of loyalty requiring that each favor NuScale's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

44. At all times relevant hereto, the Individual Defendants were the agents of each other and of NuScale and were at all times acting within the course and scope of such agency.

45. Because of their advisory, executive, managerial, and directorial positions with NuScale, each of the Individual Defendants had access to adverse, non-public information about the Company.

46. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NuScale.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

47. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

49. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of NuScale, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

50. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

51. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of NuScale and at all times acted within the course and scope of such agency.

## NUSCALE'S CODE OF CONDUCT

52. The Company's Code of Conduct states that:

> NuScale Power and its employees have a commitment to strong project performance, technology leadership, and adherence to the highest standards of quality and safety. NuScale Power must maintain a reputation for ethical conduct—both in how we operate our business and in our individual actions. We believe that in a competitive global market, continuous improvement, safety, and integrity are crucial to our success. We must be committed to safeguarding our reputation for honesty and integrity by ensuring a culture of ethical conduct throughout our operations at all times. This commitment is a vital asset that sets NuScale Power

> apart from our competitors, earns the trust of our customers, and remains a key driver to ensure the success of our business today and for years to come. . . .
>
> Our Code outlines ethical expectations for conducting business on behalf of NuScale Power and provides ethics and compliance resources to guide our daily activities and decisions. It represents the values of our Company and our responsibility to one another, our customers, and business partners, as well as to the communities where we have operations. It is about doing the right thing, honoring our commitments, treating others with respect, and being honest, fair, and forthright at all times.

53. Under the section titled "Expectations for All NuScale Power Personnel," the Code of Conduct states, in relevant part:

> It is the policy of NuScale Power, LLC and NuScale Power Corporation ("NuScale Power" or the "Company") that its personnel, which include directors, officers, full-time and part time employees, temporary employees, and contractors serving in a staff augmentation role, are expected to act with honesty and integrity in all matters. NuScale Power personnel must not only obey laws governing the workplace and the business of the Company, but also treat others (clients, suppliers, coworkers, and other stakeholders) with honesty, respect, and personal dignity at all times in all interactions. This includes adhering to the following fundamental standards of conduct:
>
> 1. Act with honesty and integrity, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships (e.g., avoid seeking or receiving improper personal benefits as a result of his or her position with the Company).
> 2. Comply with laws of federal, state, and local governments applicable to the Company, and the rules and regulations of private and public regulatory agencies having jurisdiction over the Company.
> 3. Promptly report any violations of the Company's Code of Business Ethics to the appropriate person(s). . . .
> 4. Act in a manner that shows accountability for adherence to our Code and other ethics-related Company policies including, but not limited to, the Company's Employee Handbook, Insider Trading Policy, and Nondiscrimination/Anti Harassment Policy.
> 5. Respect the confidentiality of information acquired in the course of the performance of his or her responsibilities except when authorized or otherwise legally obligated to disclose. Do not use confidential information from NuScale Power or from any other supplier, contractor, or stakeholder acquired in the course of the performance of his or her responsibilities for personal advantage. Comply with the terms of any nondisclosure agreement applicable to the work and parties as well as NuScale Power policies and procedures that govern the use of confidential information.

6. Protect all NuScale Power customer and supplier assets, and use those assets only for appropriate NuScale Power-approved activities.
7. Abide by and hold others accountable for following this Code, including Expectations for Collaborators and, if you are a finance, accounting, or supply chain professional or in the leadership team, also to Expectations for All NuScale Power Leadership and Finance, Accounting, and Supply Chain Personnel.

54. Under the section titled "Code of Business Ethics Applicability and Use," the Code of Conduct states, in relevant part:

> In addition to serving as a policy summary, there are several elements of the Code that describe our standard of higher ethical conduct. The Code, supported by our underlying policies and principles, reinforces the Company's commitment to integrity and sets expectations of behavior for employees on the job. The Code is intended to complement the Company's Standards of Conduct. In the event of a perceived conflict between the Code and NuScale Power's Standards of Conduct, please contact NuScale Power's Chief Legal Officer or Senior Director of Human Resources and one or both of them can provide guidance.
>
> The Code applies to all directors, officers, and all full-time, part-time, and temporary employees of the Company. As a representative of the Company, you must act with honesty and integrity in all matters. Certain external business partners of NuScale Power serve as an extension of the Company. . . .
>
> While the Code cannot address every issue that we may encounter, it does provide guidance and resources for those times when the right choice may not be clear.

55. Under the section titled "Compliance with Laws and Regulations," the Code of Conduct states, in relevant part:

> We aspire to do business globally and already have international offices, which means NuScale Power is a global company. Our workforce consists of citizens of many different countries and diverse cultural groups. We are subject to the laws and regulations of the United States, its states and municipalities, as well as the laws and regulations of the other countries where we do business. It is our policy to comply with all laws and applicable regulations everywhere we engage in business.
>
> It is important that each of us is aware of relevant laws and regulations that apply to our work, and that we never intentionally engage in conduct that violates these applicable standards. Not only should we be vigilant in our compliance with all applicable laws and regulations, we should also be alert to changes in the law or new requirements that may affect our business.

56. Under the section titled "Accountability and Discipline," the Code of Conduct states, in relevant part:

> Violating relevant laws, regulations, or our Code, or encouraging others to do so, exposes the Company to liability and puts NuScale Power's reputation at risk and, therefore, may result in disciplinary sanctions up to and including termination of employment.
>
> If an ethics or compliance problem does arise, your supervisor will coach and counsel you to help develop an effective solution. If, however, you fail to respond to coaching or counseling, further incidents occur or any significant infraction takes place, formal discipline may be necessary.
>
> You should understand that violations of laws or regulations may also result in legal proceedings and penalties including, in some circumstances, criminal prosecution. The Company takes a zero-tolerance position on these violations.

57. Under the section titled "Integrity in Business Relationships," the Code of Conduct states, in relevant part:

> We will only do business with other parties that conduct business ethically and do not subject the Company to criminal or other liability or cause NuScale Power reputational harm.
>
> NuScale Power conducts due diligence on third parties to ensure that their reputation, background, and abilities are appropriate and meet our ethical standards. All suppliers and contractors must agree to comply with business practices reflected in our Code and applicable policies.

58. Under the section titled "Conflicts of Interest and Business Opportunities," the Code of Conduct states, in relevant part:

> A conflict of interest occurs when your actions or your private interest interferes in any way—or even appears to interfere—with the interests of the Company. Conflicts of interest expose our personal judgment and that of NuScale Power to increased scrutiny and criticism and can undermine our credibility and the trust that others place in us.
>
> We have a fundamental obligation to make sound business decisions in the best interests of the Company independent of our personal interests. We must not take personal advantage of opportunities for NuScale Power that are discovered as a result of our position with NuScale Power or use of company property or

> information. In addition, we must not use our position with NuScale Power or company property or information for personal gain nor to compete with NuScale Power.
>
> Conflicts of interest can arise through outside employment interests, financial participation in an outside business, customer and supplier relations, family business relationships, and through excessive or inappropriate gifts and entertainment. Because it is impossible to describe every potential conflict, each of us must exercise sound judgment, seek advice when needed, and adhere to the highest standards of ethics and integrity. . . .
>
> For practical purposes, the Company cannot and does not distinguish between an actual conflict of interest and the appearance of one. Remember, all employees as well as anyone acting on behalf of the Company must make business decisions based only on the best interest of NuScale Power.

59. Under the section titled "Communicating with the Public," the Code of Conduct states, in relevant part:

> Today, businesses are under intense scrutiny from the press and the public and there are an unprecedented number of outlets for business information and news. In this environment, it is important that only authorized persons speak on behalf of NuScale Power. We need a clear consistent voice when providing information to investors, analysts, media, and the general public.
>
> Unless you are authorized by the chief commercial officer, chief executive officer, or Marketing and Communications, never give the impression that you are speaking on behalf of the Company, either verbally, written, or electronically. Care should be taken when talking with journalists or writing communications that might be published.

60. Under the section titled "Insider Trading," the Code of Conduct states, in relevant part:

> No employee may make use of nonpublic company information to trade NuScale Power securities.
>
> State and federal law and Company policy prohibit buying or selling Company securities while in possession of material nonpublic information. Material information can include information about mergers/acquisitions, financial results and projections, legal proceedings, contract awards, or other business dealings. . . .

> Directors and certain other designated persons have additional responsibilities and must obtain approval from the Chief Legal Officer prior to trading in Company securities.

61. Under the section titled "Additional Expectations for All NuScale Power Leadership, Finance, Accounting, and Supply Chain Personnel," the Code of Conduct states, in relevant part:

> It is the policy of NuScale Power that its officers, managers, directors, executive leaders, principal accounting officer or controller, or persons performing similar functions, in addition to adhering to the "Expectations for All NuScale Power Personnel," to also adhere to and advocate the following principles governing their professional and ethical conduct in the fulfillment of their responsibilities:
>
> 1. Provide full, fair, accurate, timely, and understandable disclosure in reports to investors, whether or not subject to the Security and Exchange Commission (SEC) rules, and documents and in other public communications. Each manager, director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.
> 2. Act in good faith, responsibly, with due care, and diligence, without misrepresenting or omitting material facts or allowing independent judgment to be compromised.
> 3. Proactively promote ethical behavior among subordinates and peers and serve as an ethical role model for NuScale Power.
> 4. Promote a culture of compliance and ethics regarding NuScale Power policies and procedures and all applicable laws.
> 5. Do not use Company information, Company assets, Company opportunities, or one's position with the Company for personal gain. Do not compete directly or indirectly with the Company.

62. Under the section titled "Integrity of Records and Accounting Procedures," the Code of Conduct states, in relevant part:

> We create documents and records in the normal course of business to assist in our decision-making process and to document our compliance with laws, regulations, and Company policies and procedures. All entries in the Company's books, records, and accounts must be complete, accurate, and fairly reflect our business transactions conforming to applicable accounting standards and legal requirements. This pertains to all books, records, and information in any medium, including hard

> copies, electronic records, emails, video, backup tapes, and other media. Note that fabrication or falsification of research results that is federal funded must be thoroughly investigated and properly reported. . . .
>
> Whatever your part in this process, you are required to be honest and forthcoming—if you believe a transaction or payment cannot be accurately documented without raising legal questions or embarrassing the Company, the transaction should not be completed and you should notify your supervisor.
>
> We must not improperly influence, manipulate, or mislead any authorized audit, nor interfere with any auditor engaged to perform an independent audit of NuScale Power books, records, processes, or internal controls. Essential information used for reporting, auditing, and other critical purposes must be retained in a recoverable format and must be managed securely throughout the information's life cycle.
>
> No business goal of any kind is ever an excuse for misrepresenting facts or falsifying records. It is never acceptable to create false or misleading records or otherwise conceal the truth from NuScale Power's management, auditors, or regulators.

## NUSCALE'S AUDIT COMMITTEE CHARTER

63. NuScale's Charter of the Audit Committee (the "Audit Committee Charter") states that the Audit Committee's purpose is:

> [T]o assist the Board with oversight of: the integrity of the Company's financial statements, compliance with legal and regulatory requirements, the Company's independent registered auditors' qualifications and independence, and the performance of the Company's internal audit function and independent registered auditors.
>
> The primary role of the Committee is to oversee the financial reporting and disclosure process. To fulfill this obligation, the Committee relies on: management for the preparation and accuracy of the Company's financial statements; management for establishing effective internal controls and procedures to ensure the Company's compliance with accounting standards, financial reporting procedures and applicable laws and regulations; and the Company's independent auditors for an unbiased, diligent audit or review, as applicable, of the Company's financial statements and the effectiveness of the Company's internal controls.

64. Under a section titled "Duties and Responsibilities," the Audit Committee Charter states, in relevant part:

The Committee shall have the following authority and responsibilities . . .

To review with management and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, and the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report or quarterly report, as applicable. . . .

To recommend to the Board that the audited financial statements and the MD&A section be included in the Company's annual report, and, as applicable, to produce the audit committee report required to be included in, any registration statements (whether of the Company or another entity) or the Company's super 8-K, proxy statement, or similar statements or reports filed with the SEC.

To review and discuss with the Company's independent auditors and management the Company's quarterly financial statements and the disclosure under MD&A to be included in the Company's quarterly report before it is filed; and to review and discuss any such filing with the SEC.

To oversee the Company's internal audit function, which is intended to provide management and the Committee with ongoing assessments of the Company's risk management processes and system of internal control. The internal audit function may, at the discretion of the Committee, be performed by a third party service provider, but not the Company's independent auditors. The Committee will discuss with independent auditors the responsibilities, budget and staffing of the Company's internal audit function. The Committee will take into account the opinions of the Company's internal auditors when evaluating the qualifications, performance and/or independence of the Company's independent auditors.

To review and discuss with management and the Company's independent auditors: the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information, before their release to the public; and any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. . . .

> To review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and other key risks to the Company's business, and the steps management has taken to monitor and control such exposures.
>
> To represent and assist the Company's Board of Directors in fulfilling its oversight responsibility for the Company's compliance with legal and regulatory requirements; and to review and approve the hiring or dismissal of the Company's Chief Compliance Officer.
>
> To monitor compliance with the Company's Code of Ethics and Business Conduct (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code. . . .
>
> To review, approve and oversee any transaction between the Company and any related person (as defined in Item 404 of Regulation S-K) and any other potential conflict of interest situations on an ongoing basis, and to develop policies and procedures for the Committee's approval of related party transactions.

## SUBSTANTIVE ALLEGATIONS

***Background***

65. NuScale is a nuclear power company that purportedly develops SMR technology that the Company believes will deliver safe, scalable, cost-effective, and reliable carbon-free power.

***SMRs and Nuclear Projects Generally***

66. SMRs are advanced nuclear reactors that typically have a power capacity up to 300 megawatts per unit, roughly one-third of the generating capacity of traditional nuclear reactors. SMRs are more versatile and affordable than conventional large nuclear power plants given their smaller footprint and prefabricated designs. Nonetheless, the successful commercialization of SMR technology is dependent on the ability of its developers to finance, license, construct, and operate sophisticated and complex energy-generating facilities. Importantly, SMR technology has yet to sufficiently scale and decrease energy creation costs to be economically competitive with alternative forms of energy generation.

67. SMR technology also faces steep regulatory hurdles as nuclear energy facilities require extensive local, state, federal, and possibly international oversight through all stages of development. The U.S. Nuclear Regulatory Commission ("NRC") is the primary federal agency responsible for regulating commercial nuclear reactors in the United States. The NRC imposes strict standards regarding each stage of a nuclear power plant's development and operation, from reactor design and site selection to environmental review, security, and post-construction compliance. Federal laws require nuclear project candidates to receive NRC approval in the form of licenses to operate. This licensing process for new nuclear facilities can take up to fifteen years from initial planning, and requires applicants to submit extensive documentation about the project and possible issues affecting its viability and integrity.

68. Most older operating nuclear facilities were licensed under 10 C.F.R. Part 50, which required separate approvals for construction and operation in a two-step process. However, by the 1990s, the NRC promulgated 10 C.F.R. Part 52, allowing applicants to satisfy all regulatory requirements in a one-step process. Yet, under this streamlined process, applicants remain subject to extensive review requirements before construction and commercial operation of nuclear facilities can commence. Moreover, the newer regulations, though allowing for more rapid approval to start construction of nuclear projects, are less flexible regarding on-site modifications, making them more difficult, time-consuming, and expensive.

69. Given the numerous competitive forces of other energy producing facilities, like cheaper solar, natural gas, and wind, as well as the robust regulatory environment surrounding nuclear materials, many nuclear projects have failed and gone billions of dollars over budget. These high costs translate into more expensive electricity as unsubsidized costs of electricity from new nuclear power plants can range from $141 to $221 per megawatt hour in the U.S. By

comparison, new solar facilities produce unsubsidized electricity costs, ranging from $46 to $102 per megawatt hour. Thus, for a nuclear power project to be viable, the developer must constantly be cognizant of the construction costs of the facility as sixty to eighty percent of a nuclear plant's electricity costs stem from construction of the plant itself. As the National Academy of Engineering ("NAE") stated, "[w]hile it is vital to demonstrate that advanced reactors are viable from a technical perspective, it is perhaps even more vital to ensure that the overall plant, including the on-site civil work, can be built within cost and schedule constraints."[3]

70. Additionally, for nuclear power projects to succeed, it is well understood within the industry that plant developers must have both knowledge and experience in all areas relevant to nuclear safety and nuclear technologies. According to the NAE report titled "Laying the Foundation for New and Advanced Nuclear Reactors in the United States" (the "NAE Report"), nuclear project developers "***must have a strong in-house project team***," and that team "should include substantial technical, engineering, and affiliated personnel," suggesting "***150-200 staff*** for a major project, excluding administrative support."[4] Moreover, the NAE Report indicates that "[h]istorical evidence suggests that severe cost and schedule overruns are the ***result of a lack of*** [strong, internal] ***in-house capabilities by the primary owner and operator***."[5]

71. Furthermore, SMR projects have yet to succeed in the United States, even with the NRC's diminished one-step licensing process and access to skilled and knowledgeable personnel. For example, Vogtle Units 3 and 4 reactors were permitted under the NRC's one-step licensing process, utilizing the Westinghouse Electric Company's AP1000 SMR. However, the AP1000 had

[3] National Academies of Sciences, Engineering, and Medicine, Laying the Foundation for New and Advanced Nuclear Reactors in the United States 5 (The National Academies Press, 2023).
[4] *Id.* at 94.
[5] *Id.* at 96.

significant constructability issues, and the lack of flexibility for on-site alterations under the NRC procedures, along with other manufacturing issues, caused severe delays and massive cost overruns.

***NuScale and ENTRA1***

72. NuScale was founded in 2007 as a nuclear technology company with its core technology being the NPM, an SMR designed to generate energy within a broader power plant, configured with four, six, or twelve NPMs. The Company's NPMs are factory-built including off-the-shelf components, with NuScale promising a thirty-six-month construction timeline. Since going public in 2022, NuScale has spent upwards of $1.8 billion to develop NPM. Nevertheless, NuScale has not commercialized or sold any NPMs nor entered into any binding contracts to deliver NPMs.

73. NuScale generates some revenue by providing engineering and licensing fees and services, including to its once largest shareholder, Fluor. However, these revenues are slight in comparison to the overall expenses the Company incurs. Thus, the commercialization of NuScale's NPM is critical for the future viability of the Company.

74. NuScale has some experience with the difficulties surrounding the development of nuclear power projects. For example, NuScale was involved in a plan to build the first SMRs in the United States in Idaho to provide energy to UAMPS in Utah. However, by November 2023, the UAMPS project's price tag had ballooned and timelines had been pushed more than seven years behind schedule, leading to UAMPS backing out of the project. The UAMPS failure was a severe blow to NuScale, with the Company laying off nearly one-third of its workforce. The Company's stock also plummeted 35% following news of the termination of the UAMPS agreement.

75. Before the Relevant Period, on September 9, 2022, NuScale announced it had entered into a commercialization partnership with ENTRA1 and the Habboush Group. The Company's representatives claimed that this partnership would help the Company take its NPM technology from development to deployment, allowing the Company to finally generate revenue from its NPMs. ENTRA1 purportedly sought to deploy NuScale's products by constructing energy generation facilities that contained and used NPMs and was tasked under the partnership with finding customers and managing plant financing, development, and operations.

76. By the beginning of the Relevant Period, the Company's relationship with ENTRA1 had changed. NuScale began to emphasize the significance of the Company's reliance on ENTRA1 for its future. Moreover, throughout the Relevant Period, the Company touted the deepening of its relationship with ENTRA1, which analysts characterized as effectively placing "all [the Company's] eggs in one basket." However, in reality, ENTRA1 was not the capable partner that the Individual Defendants claimed and could not effectively commercialize the Company's NPMs.

***Individual Defendants' Materially False and Misleading Statements***

77. On March 3, 2025, the Company filed its annual report on Form 10-K with the SEC reporting its financial results for the period ended December 31, 2024 (the "2024 10-K"). The 2024 10-K was signed by Defendants Boeckmann, Hopkins, Hamady, Collins, Kresa, Breuer, Warnica, Chung, Fujino, and Walters. Attached as exhibits to the 2024 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hopkins and Hamady attesting to the accuracy of the 2024 10-K.

78. In the 2024 10-K, the Company made multiple representations about ENTRA1's capabilities, including its ability to build and operate nuclear power plants "within acceptable cost,

time and risk profiles," stating, in relevant part:

> ENTRA1 ***will develop and construct new build energy plants*** that will be designated / identified as ENTRA1 Energy Plants™ with NuScale SMRs inside and ***are the ideal solutions*** addressing the challenges and meeting the objectives for the customer. ***The ENTRA1 Solution was developed to specifically address the key needs of nuclear energy deployment projects***, lessons learned from past projects, and most importantly the real-world requirements, constraints and considerations of utilities, off-takers and stakeholders. The ENTRA1 Solution is a ***"one-stop-shop"*** integrated offering to deployment that proactively ***combines facility design and construction, development, financing, licensing, manufacturing and operations*** in a framework that delivers new dispatchable, carbon-free baseload generation capacity ***within acceptable cost, time and risk profiles for utilities, off-takers and stakeholders***.

79. The 2024 10-K also referred investors to the Company's website, where the Company described that ENTRA1 "stands as a ***global powerhouse in the energy sector***" and an "***independent energy production company***," and that "***ENTRA1's capabilities extend to providing bespoke plant development, ownership, and operating mechanisms***." NuScale also claimed on its website that ENTRA1 "leverage[s] NuScale's certified SMR Technology ***to energize their diverse portfolio of power plants***, ensuring each energy consumer's distinct needs are met." The Company's website contained the following image throughout the Relevant Period:



ENTRA1

ENTRA1 stands as a global powerhouse in the energy sector, steadfast in its mission to bolster energy security worldwide. As an independent energy production company, ENTRA1 is deeply committed to navigating the energy transition spectrum to deliver power solutions that are not only reliable and cost-efficient, but also mindful of their environmental impact.

Boasting a robust pipeline of global energy projects, ENTRA1's capabilities extend to providing bespoke plant development, ownership, and operating mechanisms. They leverage NuScale's certified SMR Technology to energize their diverse portfolio of power plants, ensuring each energy consumer's distinct needs are met. In essence, ENTRA1 embodies the perfect blend of innovation and sustainability in the ever-evolving energy landscape.

80. On April 9, 2025, the Company filed a proxy statement on Schedule 14A with the SEC (the "2025 Proxy"). The 2025 Proxy assured investors that the Company was sufficiently overseeing the risks to the Company, and that the Company had sufficient internal controls in

place, stating, in relevant part:

> The Board has extensive involvement in the oversight of risk management related to NuScale and its business and accomplishes this oversight through the regular reporting to the Board by each of its committees about their respective risk oversight activities. The Audit Committee periodically reviews NuScale's accounting, reporting and financial practices, including the integrity of its financial statements, the surveillance of administrative and financial controls, its compliance with legal and regulatory requirements, and cybersecurity-related matters. Through its regular meetings with management, including the finance, legal, internal audit and information technology functions, the Audit Committee reviews and discusses all significant areas of NuScale's business and summarizes for the Board key areas of financial risk and the appropriate mitigating factors. In addition, the Nomination and Governance Committee also has a role in reducing risk through the evaluation and choice of Board members who hold management accountable, oversees the firm's integrity, charters and governance policies which guide the organization's checks and balances, and approves delegations of authority. The Compensation Committee also has a role in risk management and mitigation by ensuring that the Company's compensation philosophy and programs do not induce excessive risk-taking by management and instead reward good stewardship of stockholder investments.

81. On May 12, 2025, the Company held an earnings call for analysts and investors to discuss its first quarter results for fiscal year 2025 (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Hopkins highlighted ENTRA1's role in finding the Company customers, stating, in relevant part:

> In collaboration with our exclusive commercialization partner, ENTRA1 Energy, we are in various stages of discussions with potential customers both here in the U.S. and abroad. Domestically, this includes discussions with government officials and industries, including data centers, utilities, coal plant operators transitioning to nuclear and petrochemical and energy companies; internationally, with stakeholders around the globe in Europe, the Middle East, Africa and Asia.
>
> On the data center front, ENTRA1 continues to lead discussions with major U.S. hyperscalers with a strong focus on powering AI operations. ***Potential customers continue to be attracted to ENTRA1's commercial model, which is designed to provide financial flexibility while mitigating deployment risks***.

82. On the same day, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of fiscal year 2025 (the "1Q25 10-Q"). The 1Q25 10-Q was signed by

Defendants Hopkins and Hamady. Attached as exhibits to the 1Q25 10-Q were certifications pursuant to SOX signed by Defendants Hopkins and Hamady attesting to the accuracy of the 1Q25 10-Q.

83. Also filed as an exhibit to the 1Q25 10-Q was the Strategic Alliance Agreement dated May 7, 2025 (the "SAA"). The SAA was between NP LLC, NuScale's subsidiary, and ENTRA1, and was incorporated by reference into the 1Q25 10-Q. The SAA was signed by Defendant Hopkins. The SAA emphasized ENTRA1's purported "experience" developing, managing, and financing global infrastructure projects, stating, in relevant part:

> Whereas, the Company desires the access to ENTRA1's wide global network of relationships and appreciates ***ENTRA1's experience in connection with the development, management, and finance*** (including arranging/evaluating finance options) for global infrastructure projects[.]

84. On May 29, 2025, the Company issued a press release titled "NuScale Power's Small Modular Reactor (SMR) Achieves Standard Design Approval From U.S. Nuclear Regulatory Commission for 77 MWE" (the "May 2025 Press Release"). In the May 2025 Press Release, the Company represented ENTRA1 as an "independent power plant development platform," stating, in relevant part:

> The U.S. NRC's uprate approval of the NuScale SMR technology now strengthens ENTRA1 Energy to produce and deliver energy as the most near-term American SMR power solution via ENTRA1 Energy Plants™ with NuScale SMR technology inside. ***ENTRA1 Energy is NuScale's partner and independent power plant development platform***, which holds the global exclusive rights to the commercialization, distribution, and deployment of NuScale's SMRs.

85. The May 2025 Press Release also stated that ENTRA1 was the Company's "one-stop-shop and single hub for the financing, investment, development, execution, and/or management of ENTRA1 Energy Plants™ with NuScale SMRs-inside."

86. On August 7, 2025, the Company issued a press release announcing its second quarter results for fiscal year 2025 (the "2Q25 Press Release"). In the 2Q25 Press Release, Defendant Hopkins was quoted touting the significance of the Company's partnership with ENTRA1, stating, in relevant part:

> With that distinction, as well as our partnership with ENTRA1 to commercialize our SMR technology inside ENTRA1 Energy Plants™, we are making strides toward deploying our technology. We look forward to providing safe, reliable, and sustainable energy technology for communities around the world.

87. On the same day, the Company held an earnings call for analysts and investors to discuss its second quarter results for fiscal year 2025 (the "2Q25 Earnings Call"). During the 2Q25 Earnings Call, Defendant Hopkins touted the Company's partnership with ENTRA1, claiming ENTRA1 had experience in customized plant development, stating, in relevant part:

> Under this partnership, NuScale serving as a technology provider, sells its NuScale power modules directly to ENTRA1 for installation in reactor buildings of ENTRA1 energy plants. ***ENTRA1, in turn, develops, finances and, depending on the business model, may own and operate the energy production plants powered by NuScale's SMR technology***.
>
> ***By providing customized plant development, ownership and operating structures, ENTRA1 is able to derisk projects and meet each customer's unique needs***.

88. Later, during the 2Q25 Earnings Call, Defendant Hamady referred attendees to a slide prepared for the 2Q25 Earnings Call, which Defendant Hamady claimed demonstrated a "good explanation of the business plan with ENTRA1," presenting the following slide:




89. Throughout the 2Q25 Earnings Call, Defendant Hamady represented that ENTRA1 was a "***developer of power plants***" that use NPMs, and that ENTRA1's work as NuScale's developer was important for the Company's future, stating, in relevant part:

> But it's important to remember, when we say -- when we talk about our customers, ENTRA1 is our customer. ***ENTRA1 is a developer of power plants***. They're ENTRA1 power plants with NuScale in[side], like computers like an Intel chip, where the Intel chip inside in this case, in the power plant. . . .
>
> Whether it be a utility or government or military, whomever it is, ENTRA1's been out there selling the PPAs and selling the power. So it's -- just so we kind of cross this correctly. I want the market to understand what the story is and what the business model is because that business model, ***the fact that we have ENTRA1 as our developer is a differentiator***, right? . . .
>
> So again, we talk about customers. Let's be clear. I do this for some of our newer analysts, I think it's important. We have 1 customer, that customer is ENTRA1. ENTRA1 faces the market. ***They develop the power plants***, they sell the power. We just sell the NuScale power module where the Intel side to the laptop, if you use that analogy or whatever analogy you want to use, but we're the tech inside the power plant. We're not the power plant developer.

90. On September 2, 2025, the Company filed a Form 8-K with the SEC announcing that NP LLC and ENTRA1 had entered into the PMA (the "September 8-K"). Attached as an

exhibit to the September 8-K was a copy of the PMA. The PMA touted the alleged "expertise" and "distinctive capabilities," stating, in relevant part:

> Whereas, NuScale acknowledges ENTRA1's efforts, expertise, and strategic support and recognizes that, without ENTRA1's contributions, work, distinctive capabilities, and active involvement as a strategic partner, such opportunities would not have been available . . .
>
> Whereas, NuScale acknowledges the substantial value generated through ENTRA1's contributions and that such contributions have materially advanced the commercial development, positioning, and success of bringing its technology to market[.]

91. On September 3, 2025, the Company issued a press release titled "NuScale Proudly Supports TVA and ENTRA1 Energy Announcement of Landmark 6-Gigawatt Small Modular Reactor (SMR) Deployment Program" (the "September 2025 Press Release"). In the September 2025 Press Release, Defendant Hopkins was quoted touting ENTRA1's "experience," and how ENTRA1 was what the Company needed to commercialize and deploy its NPMs, stating, in relevant part:

> ENTRA1's team of energy and finance veterans brings exceptional value to our ***partnership—combining energy sales knowledge, investment and asset management capabilities, deep project finance expertise, and experience in delivering large-scale power infrastructure. Their experience is exactly what is required as we enter this critical next phase of commercializing and deploying NuScale Power Modules™ into ENTRA1 Energy Plants™***. Together, we are ready as partners to meet America's surging demand for reliable, carbon-free baseload power—powering AI data centers, critical mining, semiconductor manufacturing, and the energy-intensive industries that are driving our nation's economic future.

92. Moreover, in the September 2025 Press Release, the Company represented ENTRA1 as a "one-stop-shop" for the development, deployment, management, and financing of nuclear power plants, stating, in relevant part:

> ENTRA1 Energy is an American ***independent global energy production platform*** dedicated to increasing energy security by providing safe, reliable, baseload energy. ENTRA1 Energy is led by an executive team of energy, infrastructure, and finance

> sector veterans ***drawing on significant experience in the investment, development, and execution of critical infrastructure projects globally***. ENTRA1 Energy is focused on producing and selling power by commercializing and deploying American nuclear and natural gas technologies ***in its power infrastructure assets***.
>
> ENTRA1 Energy is NuScale's exclusive global strategic partner, and the two companies have an existing 50/50 joint venture company – ENTRA1 NuScale LLC. ENTRA1 Energy holds the global exclusive rights to the commercialization, distribution, and deployment of NuScale's products and services. ***ENTRA1 Energy is the one-stop-shop and single hub for the deployment, financing, investment, development, execution, and/or management of ENTRA1 Energy Plants™ with NuScale SMRs inside***.

93. The above statements in ¶¶ 77-92 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) ENTRA1 was inexperienced and did not have the established project-development capabilities or resources to commercialize the Company's nuclear technologies or build, develop, finance, or operate nuclear power infrastructure; (ii) ENTRA1 was not a sophisticated entity, but rather "just a couple of guys" with no relevant experience in the nuclear energy field; (iii) as a result, the Company's crucial commercialization strategy was entrusted to an organization without the requisite experience and abilities necessary to facilitate the successful commercialization of the Company's NPMs; (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

***The Truth Begins to Emerge***

94. The truth began to emerge following the PMA and TVA announcements on September 2, 2025. Under the terms of the PMA, NuScale was required to provide ENTRA1 with a contribution payment in the range of $35 to $55 million for every NPM placed in an ENTRA1

power plant. Moreover, the PMA provided that this contribution payment would be disbursed to ENTRA1 in tranches triggered by certain developmental milestones, specifically: (i) 15% of the contribution disbursed upon execution of a ***nonbinding*** term sheet with a third party; (ii) 35% of the contribution disbursed upon execution of a power purchase agreement with a third party in connection with the deployment of an NPM in an energy project; and (iii) 50% of the contribution disbursed upon execution of an agreement to purchase or deploy NPMs.

95. Following these announcements, analysts began to parse through the PMA and its potential consequences for the Company. For example, analysts from Bank of America reported on September 3, 2025, that the TVA agreement "implied 72 modules" that "would mean a range of $378-$594M in ***non-refundable*** payments" that NuScale was required to provide ENTRA1. Bank of America also stated that this "capital outlay [was] a risk for NuScale, given that if the projects stall there might ***not*** be recovery." Analysts from TD Cowen likewise noted on the same day that "if TVA or alternate projects do not reach" a final investment decision, then "it would appear NuScale ***could have no recovery***."

96. However, analysts did not know for certain at the time whether NuScale currently owed ENTRA1 a $500 million payment under the PMA terms at the time. For example, Canaccord Genuity stated on September 2, 2025, that they believed "Tranche 1" under the PMA was "likely achieved" with the TVA agreement. A Citi analyst likewise calculated that "a ~$500 [million] contribution from NuScale to ENTRA1 ***after*** the non-binding agreement ***is*** signed," indicating he did not believe such an agreement had been signed, and that NuScale had "cash on the balance sheet and a $500mm ATM program in place."

97. After analysts and the market digested the implications of the TVA agreement and the PMA, NuScale's stock price fell immediately after it rose following the initial announcement

of the TVA agreement. On this news, the Company's stock price fell $4.39, or approximately 10.9%, from a closing price of $40.42 per share on September 3, 2025, to a closing price of $36.03 per share on September 4, 2025.

***The Truth Fully Emerges***

98. The truth fully emerged on November 6, 2025, when the Company filed its quarterly report on Form 10-Q with the SEC reporting its third quarter results for fiscal year 2025 (the "3Q25 10-Q"). In the 3Q25 10-Q, the Company disclosed that its administrative expenses rose by almost 3,000% to $519 million in the quarter, up from $17 million the prior year. The cause of this sudden increase was NuScale's payment of $495 million to ENTRA1 pursuant to the PMA. Moreover, in the 3Q25 10-Q, the Company reported a quarterly net loss of $532 million, up from $46 million in the prior year period.

99. On the same day, the Company held the 3Q25 Earnings Call. During the 3Q25 Earnings Call, Defendant Hopkins revealed that the PMA contemplated as many as 72 NPMs for the TVA agreement, meaning milestone payments to ENTRA1 could exceed $3 billion. In response, analysts peppered the Company's representatives with questions about ENTRA1 and the PMA. For example, an analyst from Guggenheim Securities asked "[H]as ENTRA1 ever built or owned or operated anything? . . . I'm trying to understand where the actual operational capabilities and history of ENTRA1 are." In response, Defendant Hopkins pointed to Habboush Group, a separate entity from ENTRA1, stating, in relevant part:

> Yes, I can start. They're an independent global energy company, and they have, to your point, over 45 years as Habboush Group, years of experience, delivering large-scale energy and infrastructure projects worldwide. In fact, part of the due diligence we went into the program was looking at their extensive knowledge of building coal-fired plants, combined cycle plants.
>
> So they've had a lot of -- it's not -- it's a family name that is not well known in the industry, but they've had significant experience in building these plants globally.

100. When the Guggenheim Securities analyst pressed further, stating "There's no information about any projects on ENTRA1 that ENTRA1 has done at all. . . . Are you telling me that ENTRA1 has built and operated projects?" Defendant Hamady responded, stating "we are talking about the principles of ENTRA1 that have developed projects." Defendant Hamady then contradicted the Company's prior statements about ENTRA1, stating that "[i]t's not like [ENTRA1 is] out there building the power plants." Defendant Hamady also stated that ENTRA1's role was "to coordinate projects, to bring in partners, to get deals and the partners they bring in that can execute and have executed on power plants in the U.S. and elsewhere." However, the Company had previously stated during the Relevant Period that ENTRA1 would "construct new" nuclear plants, and that this was specifically part of the ENTRA1 "solution" meant to solve NuScale's commercialization needs.

101. Moreover, during the 3Q25 Earnings Call, analysts questioned the work ENTRA1 had done for the Company, referencing the approximately $500 million payment from NuScale to ENTRA1 pursuant to the PMA. For example, an analyst asked "[c]ould you maybe go through a little bit more about what ENTRA1 is going to use that money for and kind of how it helps move the project forward." In response, Defendant Hamady answered vaguely, stating that "I think the short answer is that ENTRA1 pushes that money into project development," and conceding "***I don't have a source and uses to share***."

102. Analysts were not satisfied with the Individual Defendants' answers from the 3Q25 Earnings Call. For example, on November 7, 2025, Barclays summarized the call stating that "NuScale's 3Q25 call was dominated by questions around the TVA/ENTRA1 agreement, the mechanics and implications of the Partnership Milestone Agreement (PMA), ENTRA1's credentials, Fluor's planned exit, and the company's evolving capital needs and project pipeline,"

leading to "more questions than answers." Notably, the Barclays report noted that "ENTRA1's background draws scrutiny" with many analysts "rais[ing] questions about ENTRA1, as the company is not well known in the industry and lacks a sophisticated website or public record of completed projects." Consequently, "analysts pressed [NuScale's] management on ENTRA1's credentials" because "the company's background and track record are difficult to verify, and that management had previously described ENTRA1 as having 45 years of experience."

103. On this news, the Company's stock price fell $4.03 per share, approximately 12.4%, from a closing price of $32.46 per share on November 6, 2025, to a closing price of $28.43 per share on November 10, 2025, across two trading days.

***Post-Relevant Period Developments***

104. Following these revelations, on November 14, 2025, Guggenheim Securities published the Guggenheim Report. Among other things, the Guggenheim Report described the Company's representations regarding ENTRA1 as "***problematic***," stating, in relevant part:

> We do not think [NuScale] has been as clear regarding ENTRA1 as it could have been . . . . ***Nowhere*** on [NuScale]'s website, or ENTRA1's website, or press materials regarding the TVA relationship, is Mr. Habboush's name or the Habboush Group mentioned. As recently as last week's conference call, [NuScale] management was ***still*** characterizing ENTRA1 as "an independent global energy company," although the team ***backtracked*** following some ***additional analyst questions***. Overall, we think that [NuScale]'s communications regarding ENTRA1 have been ***problematic, particularly with regards to the Habboush Group***. Our assessment contributes to how we have approached valuing [NuScale]'s stock.

105. According to the Guggenheim Report, based on analysts' own independent checks, ENTRA1 was a "3-year old company that has ***never built, financed or operated anything***." The Guggenheim Report stated that a review of available information about ENTRA1 revealed "no information regarding the company's history, management team, size or capitalization" and just "3 employees and 1 investor as of the writing of this note, notably CEO and Chairman Wadie

Habboush." Moreover, the Guggenheim Report stated that "[a] message that we sent to [ENTRA1]'s contact point on the website has gone unanswered." As the Guggenheim Report stated, a "more accurate description of ENTRA1" than the one provided by the Individual Defendants "would be that it is an entity supporting the activities of a single individual, specifically Mr. Habboush."

106. On the same day, November 14, 2025, analysts at Iceberg Research published a report critical of NuScale's relationship with ENTRA1. According to Iceberg Research, ENTRA1 appeared to share an office with NuScale, "rais[ing] questions whether the contract was signed at arm's length and whether funds are being siphoned out of NuScale." As Iceberg Research stated, "[t]he small size of ENTRA1 is reflected in its address: a WeWork office in a Houston tower where WeWork occupies the 21st floor. . . . But even more disturbing is the fact that this address is exactly the ***same*** as the NuScale Houston address. . . . In other words, NuScale wants to sell 72 reactors to a company that is located at its own address." Iceberg Research also noted that "CEO John Hopkins has consistently reduced his NuScale holdings to zero."

107. Iceberg Research also reported that Habboush Group, like ENTRA1, "has no experience in the nuclear industry," and that the "opacity of the group" is "not going to help convince regulators and the citizens of conservative states where TVA operates (Tennessee, Alabama, Mississippi, Kentucky, Georgia, North Carolina, and Virginia)." Moreover, Iceberg Research stated that the Habboush Group itself had limited operations, stating that analysts had "found fewer than 15 employees on LinkedIn that could be currently connected to the Habboush Group," and that "[t]he [Habboush] website is as empty as ENTRA1's." Like ENTRA1, the Habboush Group's address was linked to a workshare office, "a Regus office in New York."

108. Throughout this period, NuScale's stock continued to decline, trading as low as $16.96 per share on November 21, 2025, an approximately 70% decline in value from its highest trading value of $56.16 per share during the Relevant Period.

109. ENTRA1 also received further criticism after these revelations. On February 23, 2026, Politico published an article titled "'Just a couple of guys': How a little-known company could score big from a Trump trade deal" (the "Politico Article"). According to the Politico Article, ENTRA1 "is largely unknown in the nuclear industry, never completed a nuclear project and, according to the address listed on its website, is headquartered out of a WeWork office in Houston."[6] The Politico Article also interviewed Joe Osha, an analyst for Guggenheim Securities, who discussed how "NuScale ha[d] characterized Entra1 as a 'global energy company' in recent press releases and investor calls," when "[i]n reality, [ENTRA1] really just looks like it's a couple of guys[.]"[7] When ENTRA1 was asked to comment on whether it "had ever completed a nuclear project," ENTRA1 responded that the most it had done was "analyze[]" a few reactor technologies as "due diligence."[8] ENTRA1 also remained evasive, refusing to disclose how many people it employed, when it was founded, and why it operated out of the co-working space in Houston.

***Insider Sales***

110. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Hopkins and Hamady sold shares of the Company's common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

---

[6] Daniel Desrochers, *'Just a couple of guys': How a little-known company could score big from a Trump trade deal*, Politico (Feb. 23, 2026), https://www.politico.com/news/2026/02/23/energy-company-trump-japan-trade-deal-00791916.
[7] *Id.*
[8] *Id.*

111. While the Company's stock price was artificially inflated, Defendant Hopkins sold 83,694 shares of NuScale common stock, totaling proceeds of approximately $1.6 million. Defendant Hopkins made the following sales of NuScale stock during the Relevant Period:

| **Transaction Date** | **Number of Shares Sold** | **Average Price Per Share** | **Total Transaction** |
|---|---|---|---|
| May 5, 2025 | 34,675 | $17.00 | $589,475.00 |
| May 8, 2025 | 22,674 | $16.74 | $379,562.76 |
| May 15, 2025 | 26,345 | $23.66 | $623,322.70 |

112. While the Company's stock price was artificially inflated, Defendant Hamady sold 62,137 shares of NuScale common stock, totaling proceeds of approximately $1.6 million. Defendant Hamady made the following sales of NuScale stock during the Relevant Period:

| **Transaction Date** | **Number of Shares Sold** | **Average Price Per Share** | **Total Transaction** |
|---|---|---|---|
| March 7, 2025 | 31,496 | $15.70 | $494,487.20 |
| August 27, 2025 | 30,641 | $35.59 | $1,090,513.19 |

113. As a result of these insider sales, Defendants Hopkins and Hamady were unjustly enriched.

***Harm to the Company***

114. As a direct and proximate result of the Individual Defendants' misconduct, NuScale has lost and expended, and will lose and expend, millions of dollars.

115. Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Hopkins, Hamady, Boeckmann, Breuer, and Collins, among other parties, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

116. Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

117. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

119. NuScale is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

120. Plaintiff is a current shareholder of NuScale and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of NuScale in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

121. A pre-suit demand on the Board of NuScale is futile and, therefore, excused. At the time this action was commenced, the nine-person Board consisted of Individual Defendants Boeckmann, Chung, Fujino, Hopkins, Kresa, Walters, and Warnica (the "Director Defendants") and non-parties Stuart A. Harshaw ("Harshaw") and Dale E. Klein ("Klein," and together with the Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

122. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

123. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

124. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

125. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of NuScale, the Director Defendants knew, or should have known, the material facts surrounding NuScale's financial condition and internal control mechanisms.

126. Defendant Hopkins is not disinterested or independent. In addition to serving as a director, Defendant Hopkins also serves as the Company's President and CEO. Thus, as conceded in the Company's 2026 Proxy, Defendant Hopkins is a non-independent director. Accordingly, demand upon Defendant Hopkins is futile, and thus excused.

127. Moreover, Director Defendants Boeckmann, Chung, Fujino, Hopkins, Kresa, Walters, and Warnica each solicited the materially false and misleading 2025 Proxy.

128. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

129. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

130. Defendants Walters, Kresa, and Fujino (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, are specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

131. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties

required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

132. All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

133. Moreover, none of the Directors have taken remedial action to redress the conduct alleged herein.

134. The Directors' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

135. The acts complained of herein constitute violations of fiduciary duties owed by NuScale's officers and directors, and these acts are incapable of ratification.

136. Thus, for all the reasons set forth above, the Director Defendants are unable to consider a demand with the requisite disinterestedness and independence. Consequently, a demand

upon the Board is excused as futile.

**COUNT I**
**Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

137. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

139. Section 14(a) of the Exchange Act provides that:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

140. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

141. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy, which was filed with the SEC. As alleged above, the 2025 Proxy was materially false and misleading because it failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, namely risks related to the Company's partnership with

ENTRA1.

142. The misrepresentations and omissions in the 2025 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy, including, but not limited to, the reelection of certain of the Individual Defendants to the Board. Specifically, the materially false and misleading statements contained in the 2025 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Boeckmann, Chung, Collins, Fujino, Hopkins, Kresa, Walters, and Warnica to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

143. As a result of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy, the Company has sustained significant damages.

144. Plaintiff, on behalf of NuScale, has no adequate remedy at law.

**COUNT II**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

145. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

147. Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, oversight, and supervision.

148. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

149. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) ENTRA1 was inexperienced and did not have the established project-development capabilities or resources to commercialize the Company's nuclear technologies or build, develop, finance, or operate nuclear power infrastructure; (ii) ENTRA1 was not a sophisticated entity, but rather "just a couple of guys" with no relevant experience in the nuclear energy field; (iii) as a result, the Company's crucial commercialization strategy was entrusted to an organization without the requisite experience and abilities necessary to facilitate the successful commercialization of the Company's NPMs; (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

150. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though

such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

151. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

152. Furthermore, two of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the Company's stock was artificially inflated, netting millions of dollars in proceeds for themselves.

153. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

154. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

155. Plaintiff, on behalf of NuScale, has no adequate remedy at law.

## COUNT III
**Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty**

156. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

158. Plaintiff, on behalf of NuScale, has no adequate remedy at law.

## COUNT IV
## Against the Individual Defendants for Unjust Enrichment

159. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, NuScale.

161. The Individual Defendants either benefited financially from the improper conduct, or received bonuses, stock options, or similar compensation from NuScale that was tied to the performance or artificially inflated valuation of NuScale, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

162. Plaintiff, as a shareholder and a representative of NuScale, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct, and breach of their fiduciary and contractual duties.

163. Plaintiff, on behalf of NuScale, has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Waste of Corporate Assets**

164. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and ongoing throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

166. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

167. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

168. Plaintiff, on behalf of NuScale, has no adequate remedy at law.

**COUNT VI**
**Against Defendants Hopkins, Hamady, Boeckmann, Breuer, and Collins for Contribution Under Sections 10(b) and 21D of the Exchange Act**

169. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170. The Company and Defendants Hopkins, Hamady, Boeckmann, Breuer, and Collins are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Hopkins', Hamady's, Boeckmann's, Breuer's, and/or Collins'

willful and/or reckless violations of their obligations as officers and/or directors of the Company.

171. Defendants Hopkins, Hamady, Boeckmann, Breuer, and Collins, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

172. Accordingly, Defendants Hopkins, Hamady, Boeckmann, Breuer, and Collins are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

173. As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Hopkins, Hamady, Boeckmann, Breuer, and Collins.

174. Plaintiff, on behalf of NuScale, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing NuScale to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and
- strengthening the Board's internal operational control functions;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: October 28, 2026.

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**

*By:s/Timothy S. DeJong*
Timothy S. DeJong, OSB No. 940662

209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Email: tdejong@stollberne.com

OF COUNSEL:

**RIGRODSKY LAW, P.A.**
Vincent A. Licata (*pro hac vice* forthcoming)
Leah B. Wihtelin (*pro hac vice* forthcoming)
Zachary McGarry (*pro hac vice* forthcoming)
225 Broadway, Suite 3707
New York, NY 10007
Telephone: (212) 201-7690
Email: vl@rl-legal.com
lw@rl-legal.com
zm@rl-legal.com

-AND-

**GRABAR LAW OFFICE**
Joshua H. Grabar (*pro hac vice* forthcoming)
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

*Counsel for Plaintiff*